## TRAVELERS' PROTECTIVE ASS'N OF AMERICA v. WEST.

(Circuit Court of Appeals, Seventh Circuit. June 21, 1900.)

No. 607.

1. ACCIDENT INSURANCE—INJURY—EVIDENCE—RES GESTÆ.
    In an action on an accident policy, statements of insured as to the fact, nature, and extent of the injury, which he received in a basement, claimed to have caused his death, made when he came upstairs, a few minutes after the accident, are admissible as res gestæ.

2. SAME.
    Statements of insured as to the fact and circumstances of the injury made to his niece an hour after receiving it, and to his wife and son later

in the same day, were inadmissible; being mere narrative, and made too long after the injury to be res gestæ.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Frank P. Blair, for plaintiff in error.

Spencer Ward, for defendant in error.

Before WOODS, Circuit Judge, and BUNN and ALLEN, District Judges.

WOODS, Circuit Judge. This case was argued at the October session, 1899. The judgment of which a review is sought is for the amount of a policy of insurance against accident issued by the Travelers' Protective Association of America to Henry West, and made payable to his wife, Mary C. West. The declaration charges that Henry West came to his death as the result of bodily injuries caused "by accidentally striking his head against a gas fixture in the basement of a certain building located at the intersection of West Ravenwood Park and Wilson avenue, streets in the city of Chicago." This is alleged to have occurred on December 12, 1894. On December 15th, as the evidence shows, West went to New York City and Washington on business, returned home on the 31st, and on January 6, 1895, died. The testimony of the attending physician is that "the death was caused by pneumonia." There is in the record no direct evidence of the alleged accident, but a number of witnesses testified, over objection and exception, to statements of the insured on the subject. The admissibility of that testimony is challenged. The basement in which the accident is alleged to have occurred was under a drug store, the proprietor of which testified that on a day in December, 1894, Mr. West was in his store, went into the basement, and after a minute or two came up, and putting his hand to his head, said "that he had bumped his head on the gas fixture down there. He said it was very low, and he got an awful bump." A clerk in the drug store testified that: West was in the basement probably "ten or fifteen minutes." "He came up, and said he had struck his head against the gas jet in the basement. It was very low. He took off his hat, and he showed where he had crushed it in striking against the jet, and also felt of his head. He said he struck his head in the basement." The testimony of these witnesses was admitted on the theory that the statements then made were so nearly connected with the occurrence as to be a part of the res gestæ, and the ruling seems to be justified by the decision of the supreme court in Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437. That case does not seem to us to have been overruled by the decision in Railroad Co. v. O'Brien, 119 U. S. 104, 7 Sup. Ct. 118, 30 L. Ed. 299. See Association v. Shryock, 73 Fed. 774, 36 U. S. App. 659, 20 C. C. A. 3.

Other witnesses were permitted to testify on the same theory, to statements made later and at other places. Mrs. Pleas, a niece of the deceased, testified:

"We started to the city, and as we got to the drug store he was taken sick, and he said: 'Wait for me at the depot. I am going down to Bierstedt's.'

So I went on to the depot and waited. We were to have taken the 10:27 train, and he did not come at the 10:27; and just before 11:30—right before the train went—he came to the depot. I noticed he looked bad, and I says, 'Where have you been?' He said, 'I was hurt.' I says, 'You have been pretty near an hour.' Mr. Blair: That I object to as irrelevant and incompetent. The Court: Anything he said in respect to the injury I will not permit. Go on. The Witness: He said he was not able to go to the city with me. I said he had been gone nearly an hour, and he said, 'No; I received a severe blow on my head in the basement, from a gas pipe.' Mr. Blair: I object to that,—that he said he received a severe blow from a gas pipe in a drug store. I object to that statement, and move it be stricken out. (Which motion the court denied, and defendant then and there excepted.) The Witness (continuing): He said, 'It took me off my feet.' The Court: I will hear a little more of it, and see what there is in it. The Witness (continuing): I says, 'Was it very bad?' and he took off his hat, and showed me his head. I saw where it hurt his head. Then he said he would not go to the city, and I said, 'Did it hurt you bad?' and he said, 'It knocked me off my feet.' I said, 'What did you do?' I said, 'You have been gone nearly an hour.' He said, 'It is only ten minutes.' I says, 'It is an hour by the watch.' He said, 'I won't go to the city.' I says, 'Do you suffer so?' And he says: 'I can't see. I am afraid to cross the streets until I get better. But don't tell my wife.' And I went down to the city alone. The Court: That whole conversation is so mingled with the nature of the wound that I will let it all stand."

• Mrs. West, the defendant in error, testified:

"When he came up that day from the drug store, he said his head was sore. It was quite a lump. He said he had struck his head a terrible blow and it was very sore, and he showed me the lump on the side of his head."

Exception was also taken to the following answers to the fourteenth and sixteenth interrogatories in the deposition of Harry West, a son of the deceased:

(14) "Wishing to address some remark to him, I turned around just in time to see him stumble. I put up my hand to catch him. His reply to me was: 'No; I was dizzy, as I received a blow on the head from a gas pipe while groping around in Bierstedt's basement this morning.' I suggested that he do something for the bump on his head, but he laughingly remarked that he would put some arnica on it, and guessed he would be all right in the morning. After arriving at the billiard hall my father and I started a game of billiards, but my father soon gave it up and sat down; saying that his head hurt him so that he was dizzy, and could not tell a red ball from a white one." (16) "Immediately after the injury, namely, on the evening of the day on which it occurred, I know that my father was suffering a great deal from the effects of this blow that he had received upon the head in the morning, while coming from the water-closet in the basement at Bierstedt's drug store. I know this as my father stumbled and almost fell while coming down the steps of the house. He then told me that he had received this blow, and a little further down the street, while we were discussing the matter, he took off his hat and showed me where he had been struck; remarking at the time how extremely painful it was. After arriving at the billiard hall, the place for which we had originally started, he had to give up the game of billiards after making only two or three shots; remarking that his head hurt him so that he was dizzy, and could not tell a red ball from a white one. We sat around for a few minutes, and then went home. My father immediately retired to bed, I believe; at least, I know I did. There were no other complaints made to me, as I was busy at my office both night and day, and my father left the city almost immediately afterwards."

We are of opinion that the statements of the deceased to these witnesses of the fact and circumstances of his injury were mere narrative, made too far away from and too long after the occurrence to be admissible as a part of the res gestæ. In so far as they are

mere repetitions of what was said to the druggist and his clerk, they might perhaps, as urged, be regarded as harmless, but they go much further. To the druggist he said he got "an awful bump,"—an expression which by itself the jury might have regarded as of little significance; but they could hardly have treated lightly the statement to the wife, that it was a terrible blow, and to the niece, that it took him off his feet. The fact that in the testimony of the witnesses these statements were intermingled with others which were unobjectionable did not make them admissible.

It is urged that the grounds of objection to the testimony were not properly stated, but the bill of exceptions shows plainly that the court was under no misapprehension in that respect. The question presented here is identical with that decided below. The judgment is reversed, and the case remanded, with direction to grant a new trial