## UNITED STATES v. FREUNDLICH.
### No. 196.

Circuit Court of Appeals, Second Circuit.
March 14, 1938.

378

Kaufman & Weitzner, of New York City (Samuel H. Kaufman, Harry G. Herman, and Milton S. Gould, all of New York City, of counsel), for appellant.

Lamar Hardy, U. S. Atty., of New York City (John·J. Dowling and Frederick Backer, Sp. Asst. U. S. Atty., both of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a conviction for perjury committed before a special master in equity. The defendant had been sued for infringement of the copyright in a doll; an interlocutory· decree passed against him, enjoining future sales, and referring the cause to a special master to compute damages and profits. The defendant stated his account, charging himself with the sale of 676 of the infringing dolls; a figure which he also supported by his testimony before the master. The master found that he had made 1,108 dolls, and fixed damages at the limit—$5,000— on the basis of an assessment of $5 for every doll. The judge referred the case to the district attorney for prosecution, and the indictment resulted on which the defendant was convicted. On the trial

enough evidence was introduced to sustain the verdict, and the only questions raised concern the admission and rejection of evidence during the trial, and its conduct otherwise. The first three counts charged the defendant with swearing falsely that he had never made more than 676 dolls; that his account submitted in the suit so declaring, was true; and that he had no dolls left in his possession after the day of the last sale listed in the account. The fourth count charged the perjurious denial of a sale of the dolls to three persons named Slott.

The first supposed error relates to the testimony of a man named Peckman, a former employee of Freundlich's. Peckman had had an interview with one of the attorneys for the plaintiff in the equity suit, to whom he had given an affidavit that 24,000 of the infringing dolls had been made. Apparently troubled about this estimate, he went to Freundlich and told him what he had done. Freundlich said that his recollection was wrong, and they went over some records together; after which at Freundlich's instance Peckman swore to another affidavit repudiating the first, and saying that it was impossible for him to say "with the slightest accuracy" how many dolls had been shipped; though he told Freundlich that he thought his estimate of only 600 dolls was wrong. When called to the stand, the prosecution brought out these facts just as we have recited them, not prefacing them with any direct inquiry. After Peckman had said that he had no recollection of the number of dolls made, except that there had been one order of three gross, the question was put to him whether he had not testified before the grand jury that the number was between 2,000 and 10,000. To this he answered yes. The defense repeatedly objected to this testimony throughout, and was overruled; but later the judge told the jury to disabuse their minds of the affidavits and of the answer before the grand jury. This is the first error assigned.

Freundlich's interview with Peckman was competent against him as it stood, and Peckman's first affidavit—or at least its substance—was a necessary part of it. There could have been no question as to this had they talked about Peckman's prospective testimony on the perjury trial. If the proper interpretation of the interview was that Freundlich was trying to

influence Peckman's testimony regardless of the truth, it is of course well settled that that was evidence of guilt. Wilson v. United States, 162 U.S. 613, 620, 621, 16 S.Ct. 895, 40 L.Ed. 1090; Wallace v. United States, 7 Cir., 243 F. 300; Wigmore on Evidence, §§ 277, 278. If on the other hand he was merely trying to bring Peckman's memory into accord with what he himself believed to be true, the testimony did no harm, though it was not relevant. Between these two possibilities the jury alone could choose; for it is seldom, if ever, that a party can escape scrutiny of transactions with witnesses as to what they will say. Nor did it make any difference that the interview related to testimony to be given, not on the trial of the indictment, but on the suit. The issue on the trial was whether what Freundlich had said on the suit was false; that is, whether he had made more than 676 dolls. Any conduct of his justifying the inference on the suit that he had made more than that number, equally justified the same inference on the trial; the fact that in the one case he was trying to escape civil, and in the other criminal, liability does not affect the validity of the conclusion.

▆▆ The admission of Peckman's answer before the grand jury stands on another footing. We have recently said that such use of earlier testimony may amount in reality to its substitution for the witness's upon the stand, and that, while the hearsay rule remains, the error may be enough for reversal. United States v. Block, 2 Cir., 88 F.2d 618. But a witness, whose past equivocations disclose an unwillingness to speak the truth, may be prodded by his earlier declarations, even though incidentally they will to some extent get before the jury. Di Carlo v. United States, 2 Cir., 6 F.2d 364. There is always a chance that his answers may betray not only that he said what the minutes report, but that it was true. As is true of most that takes place in a trial, the right result is a matter of degree, and depends upon the sense of measure of the judge. Perhaps it was safer to have told the jury to disregard this answer; but we cannot think that, considering the vacillation of this witness, it would have been an error to let it stand.

▆ The next complaint is the admission of the testimony of one, Heppe, that he had bought Freundlich's "Kiki" dolls from a man named Engelson. This objection was based upon the absence of any proof connecting Engelson with Freundlich. However, the only person shown to have made "Kiki" dolls was Freundlich himself; and unless Heppe had confused the doll which he bought as a "Kiki" with another doll, the testimony proved the charge. There was indeed another such doll upon the market, much like the "Kiki", though distinguishable enough when placed beside it; only the jury might say whether Heppe's recollection was correct.

▆ The next error touches the fourth count charging perjury in denying any sales of "Kiki" dolls to Morris, or Mollie Slott. Morris Slott testified to buying a number of these in the summer of 1932. The defence then produced a judgment in an action in New Jersey brought by Freundlich against Mollie Slott for goods sold and delivered, and his attorney wished to cross-examine Slott upon its contents. The last charge in the account incorporated in the complaint was $170, of June 22, 1932; the next earlier, was $550, of June 14. Slott said that he had placed his order for "Kiki" dolls at the end of June or early July, and when asked whether the complaint refreshed his recollection about the matter, at first he said yes, and then no. The judgment had been taken by default, and neither Slott, nor his wife had ever seen the pleading. Because of this and of Slott's answers the judge concluded that further cross-examination along that line was useless and stopped it. We are not prepared to say that he should not have done so; the matter lay in his discretion, and it was extremely unlikely that an account prepared by Freundlich which Slott had not seen, would have any effect whatever on his memory. The judgment roll was offered in evidence and we gather that its exclusion is also charged as error. Obviously the most that it could prove was that if Freundlich did not include in his action against Mollie Slott any item later than June 22, 1932, that must have been the last transaction between the parties. When the summons issued on August 25, 1933, Freundlich had been for over a year under injunction pendente lite in the copyright suit, and he may well have wished not to include any sales of "Kiki" dolls in the account. The inference based upon the omission of this item was too slender a thread to use.

 The defendant next complains that the prosecuting attorney spoke of the award of $5 a doll against Freundlich under section 25 of the Copyright Act, as amended, 17 U.S.C.A. § 25, as a "fine"; the notion being that this implied a criminal penalty. The jury must have known that the copyright suit was civil; and in such a suit the difference between an assessment, fixed• by statute at five dollars, and a fine, is tenuous to the last degree. Nor need we pause to discuss the exclusion of the pages of Freundlich's account filed with the master which contained his cost of production. The only issue being the number of dolls sold, the computation was not in the least relevant. The defence presses the point, because presumptively their high cost and the resulting low profit disproved the existence of any adequate motive to make more dolls after the first batch; but even were that fact not too remote to be relevant, the account was at best hearsay, and Freundlich was at hand to give direct testimony.

 The last error is that the judge refused to allow two expert witnesses to testify as to how often dies, such as were used to make these dolls, must be returned for correction, and how many impressions they could make in an hour. The witnesses were die and mould makers, not doll makers, and had no first-hand ·experience of the speed of such dies. They might have been qualified notwithstanding, if they had had reason to keep themselves informed; but the defence did not seek to show that they had done so. The determination of their qualifications rested with the trial judge, and should not be disturbed—certainly not unless it appears to have been beyond any reasonable limits. Montana Ry. Co. v. Warren, 137 U.S. 348, 353, 11 S.Ct. 96, 34 L.Ed. 681; Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 559, 11 S.Ct. 653, 35 L.Ed. 270; Chateaugay Iron Co. v. Blake, 144 U.S. 476, 484, 12 S.Ct. 731, 36 L.Ed. 510; Wigmore § 561.

 The settlement of the bill of exceptions appears to have been somewhat irregular. The sentence was on July 2, 1937; the time within which to settle the bill of exceptions was extended with the consent of the district attorney on July 19, 1937, to October 1, 1937, but not by the judge who tried the case. Rule 9 of the Supreme Court Rules for Criminal Appeals, 28 U.S.C.A. following section 723a, requires all extensions to be given by the judge who tried the case, unless he is absent, rule 13; possibly he was in this case, but the fact does not appear. On September 17, 1937, the time was further extended to November 1, 1937, the district attorney opposing, by a judge of this court. Rules 4 and 9 give power to "the appellate court" to control the appeal, but it can hardly be that when the court is in recess, as it was, the court must be convened for such a purpose. A second extension until December 1,, 1937, was granted by a single judge on October 19, 1937, but this time with the consent of the district attorney. However, the bill was not settled until December 7, 1937, seven days after the last extension had expired. Had all this been under the old practice, we should have had no jurisdiction to consider the bill at all; but we understand Ray v. United States, 301 U.S. 158, 57 S.Ct. 700, 81 L.Ed. 976, to hold that under the new rules after an appeal is taken, this court has always power to control the time of ·settling the bill. Hence though Freundlich had done nothing at. all to settle the bill, as mere matter of power we should be able to let him settle it at any time; it is always a question how far the appellant's conduct or inaction have forfeited his rights. We cannot see anything here which should do so; and, indeed, the district attorney does not suggest the contrary, and could not very well do so.

Judgment affirmed.