JOHNSON, Judge
(dissents):
I cannot agree with the conclusions reached in the majority opinion filed in this case and my reasons therefor are set forth at length here. First, I think it is necessary for a proper understanding of this case to recite and analyze the evidence which was before the trial court. I am fully aware of the fact that as an appellate court, we should not try the case de novo and I am also aware of the fact that we should not substitute our judgment for that of the trier of facts, whether it be a jury or a judge without a jury. I do feel, however, that the appellate court may review the record of pleadings, affidavits and evidence with a more open mind when the trier of the facts is also the ruler of the applicable law. This is not to cast reflection upon the trial judge, but when he becomes the trier of the facts and must also determine the admissibility of evidence, I feel we should more closely scrutinize the evidence for any erroneous determination by the trial court.
In this case, the appellant, as beneficiary named in the life insurance policy, had the duty only of substantiating the existence of the policy and the death of the insured. The trial court, at a pretrial conference, ruled that the appellant-plaintiff had met this test and that the only remaining issue was for the defendant to prove that death came within the suicide exception in the policy.
The policy carried this provision:
“Suicide. If the Insured, while sane or insane, shall commit suicide within two years from the Policy date, the liability of the Company under this policy shall be limited to the premiums actually paid less any indebtedness on this policy.”
Admittedly, the insured departed this life before the expiration of the two years from the date of the policy. The only *838 question to be determined is whether or not death was the result of suicide.
Upon demand being made by the appellant for payment of the face of the policy, the insurance company tendered a refund of the premium paid, but denied other liability, asserting that death of the insured was the result of suicide within 2 years of the policy date, and therefore came within the exclusion from liability as stated supra, in the case of suicide.
Appellant filed suit, alleging the existence of the policy, the name of the beneficiary, and the death and the date thereof of the insured. Appellee filed an answer claiming that the insured’s death was due to suicide within the two years from the policy date, and tendering a refund of the premium paid. A jury was waived.
I think the reasons for my position in this case, as hereinafter shown, may be better understood, if I go into more detail of the entire proceedings than normally, and especially is this true inasmuch as a jury was waived and the trial court became the trier of the facts as well as the judge of the law. The trial judge being human, it is sometimes, in the trial of cases at law, where a jury has been waived, almost impossible for the trial judge to completely divorce from his mind and its attendant effect on his decision, allegations contained in affidavits or pleadings, alleged to be facts, but which may not be substantiated by the evidence adduced by the party carrying the burden of proof.
In the case sub judice, to begin with, a default judgment was properly entered against the defendant insurance company for failure to plead as required by the rules of procedure and law.
A motion to set aside said default judgment was made and I think the lower court was within its justifiable rights in setting aside said default and permitting further pleadings. The appellant does not find any fault with this either; but, in filing an affidavit as a part of, or attached to, and certainly in support of the motion to set aside the default judgment, a vice-president of the defendant insurance company, appellee herein, alleged that the deceased-insured came to his death from suicide and that therefore the insurance company’s liability extended only to a refund of the premiums paid. Attached also, to the motion to vacate was a copy of the proposed answer wherein it was again alleged that death was the result of suicide and that the provision of the policy cited supra as to suicide within two years of the policy date was a defense to the plaintiff’s action. An amendment to the affidavit of the vice president of the defendant was later filed which went into great detail and at great length in evidentiary matters as to why the defendant claimed suicide. This affidavit contained allegations which were hearsay and which we believe could not have been used as evidence before a jury. Also, these allegations were not wholly supported by the subsequent evidence. It is at this point that I feel the trial judge may have unintentionally permitted his mind to accept as evidence the allegations contained in the affidavits, to such an extent that he did not demand as much actual admissible evidence as necessary in support thereof.
The burden of proving that the death of the insured was suicide so as to bring the claim of the beneficiary under the insurance policy within the two year suicide provision of said policy, was upon the defendant insurance company. Ordinarily, an appellate court will not disturb the finding of fact by a jury or by the trial court in the absence of a positive showing of lack of evidence or abuse of discretion, but in the case sub judice, I am reminded of the old adage where it was said by a man he could not “see the forest for the trees.” Because of this last statement, I feel compelled to analyze the actual evidence adduced at the trial and to comment thereon.
At a pretrial conference the court took notice of the fact that the defendant had not denied any of the allegations of the complaint and pursuant to the Florida Rules *839 of Civil Procedure ruled that the complaint was admitted and that plaintiff’s case would require nothing more than the introduction of the life insurance policy. This was done.
Let’s now analyze the defendant’s testimony and evidence piecemeal: The first witness of the defendant was an officer of the defendant insurance company, whose testimony related primarily to the policy, its issuance, its rates and conditions. He did not testify as to facts relating directly to the death or cause of death of the insured.
The next witness called by the defendant was Capitola Hopkins, the widow of the insured. After a series of questions and answers relative to the witness’ background, marital life, occupation and ownership of stock in the plaintiff-appellant corporation, and a description of the physical appearance of the deceased, she was asked questions concerning his daily habits and whether he had been losing weight or not. She brought out that her deceased husband, in addition to being interested in the plaintiff corporation was also a part time employee of another firm as a TV consultant. She testified that on the day of her husband’s death, she came home about 5 o’clock p. m., that her husband was home and had been taking a nap in his bedroom and that he was dressed in a normal fashion, trousers, shirt and shoes; that he appeared to be normal and his demeanor pleasant; that he smelled of having had a drink but did not stagger nor have a flushed face; that he went onto the porch and watched a TV newscast and had dinner between 7:30 and 8:00 p. m. and that they had some sherry wine with their dinner. Her further testimony was that they prepared for bed, and her husband had on his underclothes and slippers and at 9:00 p. m., when the telephone rates changed, he called their son on the telephone. The son lived in Miami. She said this was not unusual. That the conversation with the son was pleasant and after the phone call, the deceased went to his bedroom and the witness to hers. The witness then described the bedroom of her deceased husband, the location of the bed and other furniture. Also, that the bedroom had a door opening on the “outside” into the yard. That there was a window air conditioner in one of the windows, the bottom of which came to about her waist level. She further testified that the deceased usually took seconal tablets to make him sleep. That on the night in question, he came to her bedroom and asked if she wanted one, and that he left one tablet on the dresser for her. Then he went back to his room, called her and asked if she was going to kiss him good night; she went to his room and in leaning over him on his bed to kiss him, saw this bottle of about 100 seconal tablets and thinking it best not to leave them there, dropped them in her pocket and returned to her bedroom. Shortly thereafter, he came to her bedroom and demanded the bottle of pills. Shortly thereafter, she heard what she thought was her husband getting up and then she heard a “strange noise,” which she said was “just sort of a ping.” (Emphasis added.) It was not a “loud explosion.” I think we can take judicial cognizance that a .45 pistol when shot, makes quite a noise, and especially within the confines of a house and only a short distance from the witness. She went to his bedroom within a few seconds of the strange noise and found her husband lying in the bed, with his head toward the head of the bed and his feet toward the foot of the bed, in a slight angle. He was kind of sprawled, with his head off a little ways. She also testified that he was dressed in a t-shirt and shorts which was the usual way he slept; that when she ran into her husband’s room, she found him on the bed, lying on his right side, facing the window, which would be with his back toward the dresser where the .45 automatic was found. She further testified there was nothing unusual about the deceased’s conduct on the fatal night and that he did not appear depressed or worried. It must be remembered that this was the *840 defendant’s witness and not called as a hostile witness.
The coroner testified that he came into the room, saw the deceased on the bed. That someone had pulled his t-shirt up so the wounds could be seen. [I pause here to point out that apparently the body had been touched and its position probably moved, by whom we do not know, so the testimony of the coroner as to the position of the body at the time he came into the room would be of no value as evidence in the absence of proof that the body had not been moved.] The coroner then testified that he found a “hole in the air conditioner” and he went over and took the air conditioner apart and took the bullet out and gave it to one of the policemen. The coroner did not testify that the bullet he found in the air conditioner, was the lethal bullet. He did not mention whether it had blood on it or not and neither was there any proof that the bullet so found came out of the automatic pistol found in the top drawer of the dresser. No empty or expended shell was found in the room. [An automatic throws out an expended shell when fired and recocks itself for further firing.] This witness did not know whether the automatic was cocked or not. None of the other witnesses even testified as to the condition of the gun, either, or whether it had recently been fired or whether there were any blood stains on the bullet found in the air conditioner.
The burden is upon the insurance company to prove suicide in this case and the company failed to prove or even attempt to prove that the bullet found was the one causing death, or in fact, just when it was put into the air conditioner or whether it actually came from the pistol found in the dresser drawer.
The trial court sustained an objection to the testimony of the coroner as to a statement by the doctor that the deceased had threatened suicide. I think this was a correct ruling, but could the trial court completely divorce from his mind this statement after such a long argument of counsel on the question of its admissibility was presented to the court? I am confident the trial court tried very conscientiously to do so.
The remainder of the testimony from the officers did not throw any further light on the two questions: (1) Was the bullet found in the air conditioner the one causing death and did it or did it not have blood stains? and, (2) Did this bullet come from the .45 automatic found in the dresser drawer? We find from the evidence in the record that the answer to the above questions were assumed to be facts, but no proof was offered by the appellee, from which the trial court could determine beyond a reasonable doubt that the gun and the bullet found were the lethal instruments. This is only one of several facets of this case in which we think the defendant failed to carry the burden and the trial court erred in holding it had.
To continue, there was evidence that the wound in question was probably made from a gun held several inches from the body at the time it was fired. This theory is contrary to the usual version of a suicide. Why would the party intending suicide take a chance on missing the spot of his body he wanted to hit by holding the gun away from the body ? Also, the testimony of the location of the point of entrance and of exit creates further doubt as to whether the bullet was self inflicted. There was a door opening to the outside of the room. Whether this door was locked or unlocked, no one knows. Whether someone entered, shot the deceased and stepped back out the door to the outside, no one knows. There was no effort made to determine whether there were finger prints on the gun of the decedent, or his wife, or of any one else.
In fact, all the appellee-defendant actually proved was the death by an apparent shot, but what kind it was, was not proven; that a bullet was found in the air conditioner but whether it came from the .45 automatic or not and when, is not proven; whether the *841 bullet had blood stains or not, or whether it was the bullet that did the killing was not proven. In fact no evidence was offered to establish these facts.
I feel that the defendant failed to bear the burden of proof to the exclusion of all other reasonable hypothesis to sustain proof of suicide and the trial court erred in its findings that it had and in entering the judgment for the defendant.
The majority opinion cites World Insurance Company v. Kincaid, 145 So.2d 268, wherein is cited a statement from Florida Power Corporation v. Willis (Fla.App. 1st, 1959), 112 So.2d 15, but I do not think such quoted portion is applicable to the case sub judice. I find at page 276, of 145 So.2d —World Insurance Company v. Kincaid, a quotation from an Ohio court as follows:
“ ‘It is true that plaintiff has the benefit of the presumption against suicide but where, as in this case, there is evidence to counterbalance or overthrow that presumption plaintiff must show by a preponderance of the evidence, of which the presumption in her behalf is a part, that the insured did not die as a result of suicide.’ ”
Immediately following the above quotation, however, this court speaking through the late Judge Wallace E. Sturgis, said: “We recognize that the rule there stated is applicable only to the suit against appellant World Insurance Company involved in this appeal, and does not apply to the suit against the other appellant.” (The other appellant referred to was Security Life & Trust Co., who wrote the life policy with a 2 year suicidal exception. World Insurance Company’s policy was an accident policy.)
A prima facie presumption against suicide attends an unexplained death.[1] This presumption may disappear in the face of positive evidence to the contrary, but merely probable evidence is insufficient to establish suicide.
This being a life policy with the exclusion of liability in the case of suicide within two years, the burden was on the defendant to show death was by suicide. The trial court found the preponderance of evidence to favor suicide. This, to me is an improper finding in a case of this kind. In fact, the only evidence offered was that attempting to establish the defense of suicide and therefore a mere preponderance is insufficient because there was no burden on the part of the plaintiff to negate suicide. There are too many unanswered questions. The defendant’s entire case is based upon assumptions. The defendant’s chief witness was the widow, and the defendant is bound by her testimony. She testified she heard a “ping”, not a “loud explosion.” This testimony alone refutes the rule laid down in the World Insurance Company v. Kincaid case supra. There had to be a loud explosion or a silencer used on the gun. A question may be raised, and I certainly do not infer guilt on her, as to whether or not the finger prints of the widow appeared on the gun? Also, why was no effort made to determine whether or not there were blood particles left on the bullet found in the air conditioner? If any test was made by the defendant and no traces of blood appeared thereon, certainly the defendant would not bring this matter out and the plaintiff had no duty to do so. Another question of importance and one which I think was incumbent upon the defendant to prove, was whether or not the bullet found in the air conditioner was fired from this particular .45 automatic?
The first parties on the scene, exclusive of the widow of the deceased, jumped to the conclusion that the case was suicide and from there on, including the time of trial of this case, everything was based upon inference and conclusions not substantiated by the facts. And, we should not lose sight of the fact that the burden of proof rested on the defendant at all times to prove beyond any other reasonable hypothesis, that death resulted from suicide.
*842 There are so many unanswered questions in the defendant’s case and unexplained lack of explosive sound and lack of proof connecting the death, the .45 automatic and the discovered bullet together, that I cannot agree with the majority opinion nor the decision of the trial court. The defendant had the burden of explaining away or of establishing these facts before the court could say with certainty that suicide did exist. I think the defendant failed to carry the burden in this respect. The trial court committed the human error of not being able to divorce his mind from the case built up by the defendant in its affidavits and pleadings, which did not constitute evidence. I must therefore dissent.

. Mutual Life Ins. Co. of New York v. Johnson, 122 Fla. 567, 166 So. 442, (Fla.1935).